CENTRAL TRUST Co. OF NEW YORK *et al.* v. WABASH, ST. L. & P. RY. Co. *et al.*, (CINCINNATI, I., ST. L. & C. RY. Co., Intervenor.)

*(Circuit Court, E. D. Missouri, E. D.  May 1, 1889.)*

1. CONTRACTS—MUTUAL ASSENT.

Intervenor's freight agent at Cincinnati telegraphed to the receivers' freight agent at Springfield, Ill.: "Am asked to name rate on coal for Gas Co., Cin't. to Springfield, Ill. Can I make necessary rate, divided on agreed per cents., via Lafayette?" The receivers' agent answered, "You are at liberty to make necessary rate on coke to Springfield Gas Co. and prorate on agreed per cents. via Lafayette, Ind." Intervenor's agent, on receipt of this, replied: "See my wire 29th regarding rate on coal for Gas Co., Springfield. Answer." This was responded to by a second telegram saying: "You are at liberty to make necessary rate on coal for Springfield Gas Co.," etc. *Held*, that the receivers could not repudiate the transaction on the ground that permission was given to make a rate only on coke, and not on coal.

2. SAME—CONSTRUCTION—SURROUNDING CIRCUMSTANCES.

The receivers' freight agent had lived in Springfield, where the gas company referred to in the telegrams was located, for a number of years; and he admitted that if he had understood the telegrams to refer to coal, he would have taken them to mean a season's supply of coal for the gas company. *Held,*

that the defense could not be made that the contract evidenced by the telegrams was for an indefinite quantity of coal, and did not authorize the intervenor to make a contract for transportation of 5,000 tons of coal for the gas company, to be delivered during the year.

3. SAME—DISPUTING CONTRACT AFTER PARTIAL PERFORMANCE.

The receivers having been notified of the contract made by the intervenor with the shipper on the strength of the telegrams, and having complied therewith until it was half executed, it is too late to object that the telegrams did not authorize a contract for shipment of so large a quantity.

On Exceptions by Intervenor to Master's Report.

This was a proceeding by the intervenor to compel the receivers of the Wabash, St. Louis & Pacific Railway Company to refund freight overcharges on 5,000 tons of coal transported over intervenor's line from Cincinnati to Lafayette, Ind., and thence over the road in charge of the receivers to Springfield, Ill. In January, 1885, the following telegrams were interchanged between the intervenor's general freight agent and the receivers' division freight agent, stationed at Springfield, Ill.:

"JANUARY 29th, 1885.

"*H. D. Gould, Wabash Ry., Springfield:* Am asked to name rate on coal for Gas Co. Cin't to Springfield, Ill. Can I make necessary rate, divided on agreed per cents., via Lafayette? H. J. PAGE."

"JANUARY 30th, 1885.

"*H. J. Page, Cincinnati, Ohio:* You are at liberty to make necessary rate on coke to Springfield Gas Co., and prorate on agreed per cents., via Lafayette, Ind. H. D. GOULD, Sem."

"JANUARY 31st, 1885.

"*H. D. Gould, Springfield:* See my wire 29th regarding rate on coal for Gas Co., Springfield. Answer. H. J. PAGE."

"JANUARY 31st, 1885.

"*H. J. Page, Cin., O.:* You are at liberty to make necessary rate on coal for Springfield Gas Company, and prorate on agreed per cent., via Lafayette. Second Answer. "H. D. GOULD, D. F. Agent.
"RYAN."

At the time the telegrams were sent, by an agreement then in force between the intervenor and the receivers, the through rate on property transported from Cincinnati to Springfield was divided in the proportion of .5299 per cent. to the intervenor and .4701 per cent. to the receivers. Acting on the telegram of date January 31, 1885, intervenor's general freight agent in April, 1885, entered into a contract with the Marmet Coal Company to transport 5,000 tons of coal from Cincinnati to Springfield for delivery to the Springfield Gas Company at the rate of $1.25 per ton. Prior thereto, and after telegraphic correspondence aforesaid, intervenor's freight agent had named a rate of $1.25 per ton to the Marmet Coal Company, and on the faith thereof the Marmet Coal Company had made proposals to supply the Springfield Gas Company with 5,000 tons of coal delivered free on board cars at Springfield, Ill., which proposals had been accepted. The receivers' general freight agent complied with the contract made by intervenor's general freight agent until 65 car-loads of coal had been shipped and freight collected. He thereafter

refused to comply with the agreement, and collected freight at the rate of $2.80 per ton.   Intervenor, having refunded to the Marmet Coal Company the overcharges so made, filed its intervening petition to recover from the receivers their proportion of the sum so refunded.

*John C. Orrick*, for intervenor.

*H. S. Priest* and *George S. Grover*, for receivers.

THAYER, J.   I have examined all of the testimony in this case, and am unable to concur in the conclusion announced by the master in his report.   I think the testimony shows an agreement on the part of the receivers to allow the intervenor to make such through rate on coal shipped to the Springfield Gas Company, from Cincinnati, Ohio, as intervenor might deem proper, and to divide the through rate in certain proportions theretofore agreed upon,—that is to say, the receivers to have .4701 per cent. and the intervenor .5299 per cent.   The master seems to have regarded the telegrams mentioned, as though sent by Mr. Gould, or by his authority, and in that I think he was right.   The answer to the intervening petition did not deny that the telegrams passed between Mr. Gould and Mr. Page.   It averred simply that the messages all related to the transportation of coke.   By this I understand the pleader to mean, simply, that the word "coal" should be read "coke" wherever it appears in the messages; not that the parties who indited the messages in the name of Mr. Gould had no authority to send them, or to reply to Mr. Page's inquiries.   The master apparently took the same view. He concludes, however, that as Gould meant "coke" when he said "coal" in the telegram of January 31, 1885, whereas Page had asked him about "coal," that there was no such *consensus* or meeting of minds as will make a contract.   This conclusion I am forced to regard as erroneous.   There must be a meeting of minds to make a valid agreement.   But where propositions are made and accepted in writing, and the language used is not ambiguous, parties cannot be permitted to say that they meant something entirely different from what the language imports.   Mr. Page first inquired about "coal."   In response Gould gave him permission to name a rate on "coke."   Page then requested him to see his telegram concerning "coal," and Mr. Gould, after his attention had thus been explicitly called to the message of January 29, 1885, which read "coal," gave him authority to fix a rate on coal.   I do not see upon what principle the receivers can be allowed to say that their agent meant "coke," but inadvertently used the word "coal," and hence that there was no contract.   That view of the law would permit any agreement in writing to be upset by oral testimony.   If the language had been fairly susceptible of two meanings, so as to lay the case open to oral explanation of what was intended, and it appeared that the contracting parties had in mind a different subject-matter, it might well be said that there was no meeting of minds, and hence no contract.   But that was not the case.   Authority to name a rate on coal was asked, and such authority was given.   A merchant asked to name a price on sugar, who should comply by naming a price on the article mentioned, might as well defend by saying that

there was no *consensus* because he meant "salt" when he said "sugar." It appears to me that a defense of that character ought not to be allowed. I think that the master made a wrong application of the doctrine invoked.

It is contended by the receivers' counsel that, even if the telegrams constituted a contract, it was indefinite as to the amount of coal to be shipped, and as to the time during which shipments were to be made, and that it did not authorize the intervenor to make a contract for the transportation of 5,000 tons of coal to be carried during the year. I cannot concur in that view of the case. The telegrams must be read in the light of all the surrounding circumstances. The parties between whom the telegrams passed were freight agents of two connecting railroads that together formed a continuous line between Cincinnati, Ohio, and Springfield, Ill. These roads appear to have interchanged freight in considerable quantities, and to have had intimate running relations. The percentage that each should receive of the through rate from Cincinnati to Springfield, and *vice versa*, had already been settled by an agreement theretofore made. Intervenor was asked to name a special rate on coal in view of a proposal about to be made by one of its customers to supply coal to the Springfield Gas Company. The telegrams addressed to Gould advised him that a rate had been asked on coal to be shipped to the Springfield Gas Company. Mr. Gould had been stationed at Springfield as division freight agent for a long time prior thereto, and probably knew about what quantity of coal that company bought, and how it was moved. He was advised, therefore, of the commodity to be shipped, and the name of the consignee, and in all human probability had an approximately correct idea of the amount of coal to be carried, and the period during which shipments would continue. Mr. Gould himself says that if he had understood the telegram to relate to coal, he should have understood it to relate to a season's supply of coal for the gas company. Read in the light of these circumstances, and the relations existing between the parties, the telegrams, in my opinion, fully authorized the contract made by the intervenor with the Marmet Coal Company.

But, even if the contract made by the intervenor was in excess of the authority conferred by the receivers through their agent, Mr. Gould, the fact nevertheless remains that, after being advised of the contract with the Marmet Company, and that intervenor would hold them to the agreement made by Gould, the receivers nevertheless complied with the contract until it was half executed, that is, until August or September, 1885. It was certainly too late to ignore the contract after such a long period of acquiescence. In my opinion, therefore, the receivers ought to live up to the bargain made by their agent, even though it does entail a considerable loss, and even though Mr. Gould acted under a misapprehension when he gave Mr. Page permission to name a rate on coal. In view of the authority given to Mr. Page early in January, 1885, to name a rate on coke, it is difficult to understand how Mr. Gould came to read the telegrams of January 29th and 31st as relating to coke. I have

looked through the testimony carefully, and I cannot find the slightest evidence of any bad faith on the intervenor's part. The exceptions to the report will be sustained. The intervenor's claim in the sum of $4,322.23 will be allowed, but, inasmuch as the master reports that intervenor is indebted to the receivers in the sum of $1,419.99, the receivers will be permitted to file a counter-claim for that sum, and it will be allowed, and deducted from the sum of $4,322.23, making intervenor's net allowance, $2,902.24. A reference back to the master is unnecessary.